I call the last case of the morning, Oshore Marine v. Palm Energy v. Chet Morrison Well Services. Good morning, Your Honor. Robert Reich and Micah Wazicki on behalf of Chet Morrison Well Service, which I'll call Chet Morrison or Chet for short. Your Honor, the original issues in this matter was who chartered the Nicole E. Mard and who owes charter hire. There was never an allegation of any property damage, nor could there be, because as a practical matter, that claim was probably time barred, A, and B, comparative negligence and fault would come into play. So the plaintiff elected to pursue a claim strictly under contract. Now, there were two contractual theories that were asserted. One was for charter hire, and in the complaint, the plaintiff said that the vessel went on charter and remained on charter throughout the period of time until it was able to go back to service. The second complaint, or the second element, was that there was a subsequent contract between Palm, John Garrett, and Chet Morrison, and OMC, where they agreed to pay for the $400,000 worth of property damage. The court found that contract didn't exist. In fact, the court found that Garrett agreed to submit it to his insurance carrier, but they refused it. So there was no contract on the second part. So we're here on the charter party. That's the only issue that's before us. And in this case, then it's a trial de novo, because we're dealing with a contract. Now, the court found that John Garrett had agreed to have OMC direct a bill to avoid the 15%. That's important. If you say, I agree to be directly billed, implicit in that is, I'll pay. I mean, why would you be directly billed if you're not planning on paying? And what the court found initially is that Palm agreed, quote, to assume ultimate liability for the charter fees. So Palm had to pay, and his failure to pay is what precipitated this litigation. John Garrett testified that charter hire was owed. And this is the corporate deposition of Palm, which is binding on Palm. Charter hire is owed as long as the vessel remains on location. And then he said, customarily until it goes back to the dock. And it was on that testimony that the court found that charter hire was owed through August 18th. Even if the vessel's not working to the benefit? Well, yes. We argued, we argued, no, when the vessel stops working, charter hire ends. And, uh, in fact, Avis Borg and Emard said it's not appropriate to charge when the vessel can't work. Well, what if the vessel is just waiting on site to go to its next job? Well, that's not working for you. The vessel was not waiting on site to go to his house, but it would be the same presence without having any benefit because if the vessel was waiting on site, we couldn't be charged either. In other words, if the vessel is waiting on site, charter hire isn't owed by anybody. The vessel was waiting to get his leg up. Yes, Your Honor, it was waiting to get his leg up. But, and I agree, charter hire was not owed past August 1st. And of course, that's what we argued. And that we have argued that. But the courts found, the court found based on John Garrett's testimony, and again, he's the guy who committed to pay charter hire based on that testimony, charter hire customarily, and in this case, based on that testimony, was owed until the vessel left the location. And that's a fact finding. If I remember, the court cited three different witnesses for the proposition that charter hire is port to port. Yes. Okay. And you don't dispute, you are not urging to us that's a clear error. In your principle brief, I didn't see you raise it at all. In your reply brief for the first time, in the first paragraph, you say, well, no, that's not correct. It would only be until they stop working. I, while I believe it's clear error, the point is that since it passes through, my position on that is a little bit sort of, I feel they're more important issues to address. And so, while I agree you can't charge for a vessel when it's not usable, I mean, look, the facts of this, it got stuck on location because of the bottom that it was jacked up in. Okay. The mud was too soft and Palm told them to jack down there and they jacked down there and they got stuck. Now, I believe customarily if a, if a well owner operator tells you to jack on location and they jack you in a bad place and you get stuck, the well owner pays for it. And I think John Garrett said he's right. I mean, you, you put them there, you told them to jack up next to your well, it got stuck, it got stuck because of the bottom. So I think that, that, that. That isn't an argument you're making to us here now. No. The argument that I'm making here to you right now is that John Garrett testified on page 87 of the corporate deposition, which is in favor of charter hire, whatever the amount is, is Palm responsible? And he said his answer, charter hire? Yes. So Palm agreed to pay the charter hire. Well, well, you, I think Judge Vance's conclusion was more specific than that. That Chet agreed to make the charter hire and, and sub, in addition to that, you have the master service agreement that you're going to get paid back by Palm, which is exactly what happened with HCR. There was a phone call, as you point out, about a markup, but it didn't ever get reduced to writing anywhere. Is that all correct? Well, there was a, a, a, a tradition, a custom 15% markup. But what Palm said is, look, bill us directly to avoid the 15% markup. And in fair, fairness, John Garrett thought he can negotiate with lift boat owners and get a little reduction after that. But they never get billed directly. So Judge Vance's conclusion is, get billed they refused to pay it, but ultimately they never billed us. And there was, they billed us initially, we rejected it and they agreed. And thereafter they pursued their claim against Palm. They build, rebuild, kept Palm updated, filed a claim in bankruptcy. And, and here's the thing under the charter, uh, paragraph two, I believe of the charter, Palm has 30 days to pay or dispute. They did not pay. Un, it's uncontested that Chet Morrison billed Palm initially for the charter hire with a 15% markup and Palm rejected it saying, you told, they were supposed to bill us directly, I'm not paying the 15%. Fine. Under the charter, they have to pay within 30 days. They didn't pay. And that's why we're here. We're here. If Palm would have paid, we'd never have been here. If Palm would have accepted, they could have paid us and we paid, uh, uh, OMC directly, but they didn't do that either. They didn't pay us. So to suggest then that somehow Palm has any rights against us, they breached their charter. They had an obligation to pay, which they did not do. So they breached their charter. Now, the court talks about the indemnity agreement and the indemnity agreement refers to claims for property damage or loss. It talks about personal injury or death, which relate to people and property damage or loss, which relate to people. This is charter hire. To suggest somehow that if I don't pay charter hire, that's a loss and therefore I can go around and never pay charter hire. And if you sue me, then I get my attorney's feedback is absurd. I thought the property damage was in reference to the repairs to the leg. No, Your Honor. She, she did not find that. She, now, and there was no claim. That was the claim, right? No, Your Honor. It actually, there wasn't a claim for property damage for repair to the legs. There was a claim for a contract or an alleged contract whereby Palm allegedly agreed to pay. That is not, that's outside the charter. That's a separate contract. It doesn't have anything to do with what we did. It has to do with what allegedly Palm contractually undertook. She found there is no claim for property damage that's, that's enforceable. And that issue's not in front of us, right? That issue, they did not appeal. The second count in the offshore complaint isn't voting. Right. They did not appeal because So, so if you accept her conclusion of fact that it's port to port charter hire, um, I think the logic is that, well, but there was a separate release as to Palm for death, injury, property damage, or loss. And the argument would be, well, there was lost time when, during the period of time when the charter, when they weren't working on the well. And that would be a detention claim. Lost time is the charter, the extra charter fee. Well, Your Honor, a detention claim is a lost time claim. A detention claim is not based on charter hire. A detention claim is based upon lost profits as a result of property damage. We don't have a claim for detention here. What we have is a claim where they say you chartered our boat and you're obligated to pay for it till you quit using it. And the judge said the date you quit using it is the date it left the site, based on John Garrett's testimony, not my testimony. I just disputed that based on John Garrett's testimony. Well, the judge said that you stop paying charter hire when it gets back to port. So then the subsidiary question is, well, what about the time when it's still on site but it isn't working until reentry at port? She found charter hire as owed. I know she did. But then she also finds that the release exempts the portion of time where there was no working profit making. It was, in fact, a lost period. I'm talking about the indemnity agreement. Yes. There is no release. The indemnity agreement, again, are strictly enforced, strictly construed. There's nothing in the indemnity agreement that says we have to indemnify them for charter hire. It's intended. It is intended if your property gets damaged or lost, you got a tool that gets dinged up or you throw it overboard and it gets lost, then you can't sue me or your contractor can't sue me for that property. You're saying the word property modifies both damage and loss. Yes. Yes, obviously it does. Why do you say that if it's death, injury, property damage, loss, commas? Why does property modify loss? Because of the way in which it's framed. It's injury or death, which refers to people. Property damage or loss refers to property. It's property loss. It can't be any loss. It would be absurd to suggest that I don't pay charter hire and somebody sues me and says, you didn't pay charter hire. I'd like to move, if I can, because there's a couple of things that I do feel we need to address, and that is the interest issue, because that is a second element. Now, I concede that as a general rule in a maritime case, interest is the rule rather than the exception. I'm not contesting that. But the exception is real tubing. Real tubing discusses the exception, and real tubing is still law. Now, the middle one of real tubing has kind of been negated, and I'm not arguing that anyway. So the first and second, delay, and the third, you recover a lot less than you demanded. Okay? Now, she, first of all, delay. The case was delayed three years because they went after the wrong party. They never came to us and asked us to pay. They never filed suit against us for three years. They billed us. One time it was rejected. They agreed and billed the other people and never came back to us and said, we changed our deal. So you have a delay brought about by their action, three years. Secondly and importantly is they recovered, even if you take out the 400,000 property damage, the charter hire was a million six or so, a million seven. They recovered one third of what they demanded for charter hire. Clearly they recovered a mere fraction. However, and I feel that's a very strong argument, but if you find interest is owed, okay, because interest is the rule, the court can't arbitrarily pick 18 percent. There's never been a case that I'm aware of where a court arbitrarily picked 18 percent. And you have to understand that the purpose of interest is not to make somebody profit. It's not to punish the wrongdoer. It's simply to make the injured party whole. Okay? And never has there been a case where a court awarded 18 percent without any evidence to say that that figure was an appropriate figure. Now in this case what the court found is basically a contract. So I believe it's a de novo review because the court found that a bill, an invoice that was rejected by us, there's no course of dealing. The court found we never worked for them before. We had no written contract. There was no course of dealing with these people, no history, no custom in the industry. There was no evidence as to what it cost them to borrow money. There was no evidence as to what they lost by not having the money. She just found you send an invoice and it says 30 days, one and a half percent, period. We didn't sign it. We didn't accept it. We rejected it. So that is not an agreement to pay 18 percent a year. You know, if you borrow money on your house and you say you're paying 5 percent interest, that's 5 percent per year. It's not 5 percent per month. I have to point out, I realize court has discretion in awarding interest, but there's got to be some rational basis for awarding that. To say 18 percent, why not 50 percent? Why not 100 percent per year interest or 100 percent per month interest? There's got to be some restriction. The Cashman case, which is what she cited, is based on specific long-term contractual relationship over several years. In those written contracts, it provided one and a half percent per month, and the court found that as a course of dealing, the parties understood it was one and a half percent per month. Now, the Cashman case came up here, but it wasn't, the interest issue wasn't decided. Your Honor, Judge Clement, you handled a case that was remanded back to Judge Zaney on interest, but Judge Zaney awarded interest at the legal rate, okay, which is historically in maritime cases what has been done. The legal rate is what is awarded absent evidence to the contrary. There was no evidence to the contrary. The court can't arbitrarily pick a number of 18 percent and say, oh, that's the interest rate I'm going to apply. Finally, I think that what we have to understand here with respect to this situation is that we are here because Palm, who admittedly agreed to pay charter hire, did not pay charter hire. Palm cannot come here having breached, and that's the Mobile case, which is still good law. The Mobile case says you can't breach a contract and then claim indemnity. To quote the Fifth Circuit, that would be ridiculous, and I would agree that would be ridiculous just to say you don't pay and then you can get attorney's fees. All right. We've got it. Thank you. Thank you. Mr. Goodwine. Your Honor, I'm Mr. Bowman. If that's okay with you, Goodwine and I decided that I would go first. I think it makes the presentation a little bit better. We also agreed that I would go second. I think that's a good time allotment. I think he has more to talk about. If it's okay with the Court, I'm Martin Bowman. I represent Offshore Marine Contractors. May it please the Court, there were a couple of things that Mr. Reich mentioned to you initially that I want to clarify. The effect of this tossing about of these terms like charter and customer really muddies the waters here, not to use a maritime analogy, but it really does, because it obscures what the trial court did. Judge Vance's opinion is very well reasoned and it is very detailed in what it does, and it draws an appropriate distinction between my client, which is Offshore Marine Contractors, and the relationship between my client and Chet Morrison and Mr. Goodwine's client, Palm. For example, and I want to do this just to heighten the distinction, Mr. Reich, when he was up there, said that Palm agreed to pay charter hire, but they didn't. Palm never agreed to pay charter hire. Palm agreed to pay contractual charges to its customer. The only charterer in this case is Chet Morrison, so the only person that would pay charter hire is Chet Morrison. It illustrates the fact that Palm would have agreed to pay pursuant to the contract, because Chet, but it wasn't a charter hire contract. Remember, Chet chartered the boat. What was it? What did they agree to pay? Well, they agreed to pay a lump sum based on all the services that were being performed, and I'll defer to Mr. Goodwine on that, but this is not a charter hire. Was it based on the charter hire? Excuse me? Was that amount based on the charter hire? No, absolutely not. It was inclusive of a lot more than just charter hire. They want work done at the two sites they own, if you put them, and in turn, as I understand it, Chet hires you, a lift boat owner. Right. A subset of the charges that Palm agreed to pay would have been my charter hire, but Palm never agreed. That's what I just asked her. Well, but it was a subset of that, and that's where we get to the second issue. Let me, I'm going to, I think I can clear this up in a very short order. The key here really boils down to the distinction of the relationship between myself, my client, OMC, and Chet, and Chet and Palm. The first claim that was made was a claim for charter hire. We brought that suit against both because Chet Morrison, quite frankly, told us that Palm chartered the boat when we actually thought it was Chet Morrison. So we, our claim was the who shot in the dark kind of a claim. We knew somebody chartered our boat, and we wanted the court to make that determination because we couldn't even get there. And in that first claim, though, it's charter hire port to port. You didn't subdivide downtime. You're right. Okay. Absolutely right, Judge Higginson, and no, we didn't. Mr. Reich seems to banty about this $400,000 figure saying that we didn't sue for, but we didn't. We sued for charter hire. Now, this is the issue, and this is where Judge Vance really got it right, okay? And this is the key to the case, is that normally, in every charter, you go port to port, and if you look at the exhibits that were admitted, specifically the work order, there were mobilization and demobilization charges. That means mobilization is from the port to the site. Demob is from the site back to the port. That was the deal we had with Chet. Now, and this is an important factual distinction, and that's really what we're talking about here. We're talking about the facts. Now, the salient fact in this case, which distinguishes it from the other universe of charter hire claims, is that the leg was cut. The leg was cut by an affirmative act. We argued that was the second contract. So by cutting the leg, just hear me out, by cutting the leg on, what was it, August 18th of 2008, we terminated the charter, because you can't charter a boat with two legs. So by doing that, we voluntarily agreed, and this was our second claim, that there was a contract, which we lost on. I didn't like it when she ruled, but I thought her ruling was correct, and we did not appeal that. Now, what she said was, we didn't prove that there was a contract after the 18th, but she wisely, I think, determined that the charter hire ended on the 18th, when the vessel was no longer in service. Had we not cut the leg, and had we left it out there for two months, or three months, yes, charter hire would have been owed until it got back to the port, but we didn't do that, because we thought we had a second deal. That's not really consistent with customary practice. If you have an incapacitated piece of equipment, you can't just keep charging them. I mean, I guess that's, well, you cut the leg because the storm was coming, is that the? Yes, ma'am. Your Honor, we cut the leg because Hurricane Faye was entering the Gulf, and we thought it was a prudent thing to do, but we did it by agreement. When a vessel is temporarily stuck on location, the charter hire goes. The charter hire what? It continues. But what if you didn't have another job, and you just decided to leave it there? That's really not fair, is it? It's not customary, or? Well, no, we would never have been allowed to do that. I mean, remember the charter has a representative on the boat that tells us where to go, when to jack, when not to jack. The idea would have been that we would have somehow left it there. I guess we would have had a fraud claim for leaving. But if the charter hire, I mean, you work in the industry, so this may just be my ignorance, but if the charter hire ended when the leg wouldn't . . . had to be cut, what about if you had some lesser malfunction of equipment that meant for a day or two it couldn't work? Would your claim be that the charter hire wouldn't encompass those days? Absolutely does. It does. There are days . . . So then why am I not right in reading Judge Vance's order that says the charter hire actually continued all the way back to demobilization? It's just that there was a period of the charter hire that became a loss. Actually she . . . I would disagree with that. I don't think that's what she said. Okay. All right. She actually said that the charter ended on the 18th when the leg was cut. And the issue is the second contract, the claim that we didn't prove, was for downtime charter. Judge Clement, you said something that was correct in your questioning here, and I thought it was important to note, which is that Judge Vance's opinion only talks about that loss in the context of the second property damage claim. She never actually talks about that in connection with the first claim. And Chet is muddling that together. I'm thinking it's footnote 79. I thought the court explicitly found that the charter extended until port return. That's the custom. That's the custom. Okay. But she said there was an exception to the custom here? Well, she said that once we cut the leg, yes, that we took the vessel off charter. Okay. But when did it get back to port? The charter ended on the 18th. You took it in right then, right? And after you cut the leg, you took it in. Yeah, that's what freed it up. That's what enabled us to do that. Now, there was what we call downtime charter after that when the boat was demobbing back to port and while it was laid up in port. Okay. So I'm sorry. So your argument is still under charter during the two weeks before they cut it? Right. Now, what she did was she said it was no use to the customer, but it was still on charter. So that's why she stops their charges before she stops our charges. It didn't cease being on on charter until the leg was cut, which is the 18th. She tabs them out on August 1st because she says their customer relationship doesn't allow for that. But it's still the charterers obligation. And that's the issue here. The charterer is the person who has to pay for the charter hire and the charterer is Chet Morrison. Those eight minutes went pretty quick and I didn't get to the interest. That's what happens when you split your time, which is I know. But I did think it was fair at the time. Maybe I'd like to have those two minutes back yet. You can ask co-counselor. You want him to have two of your minutes? And I actually I can do it in less than that on the interest issue. If I know you, Higginson, I know you're on this issue about the charter. Is there another? No, that's fine. You better get going on. I'm going to get going on this real quick. I do think it's an abuse of discretion standard. I do agree that real tubing applies. Mr. Reich says there must be some parameters for the trial court, but I think the parameters are the discretion. The court one and a half percent per month is customary. That's what the court found. I don't think there's any reason to be left with the opinion that something has gone horribly wrong in the Eastern District. I think that's a perfectly valid consideration given the fact that she only assessed interest on the actual charter hire that she found Chet Morrison was due. I don't think any of the other real tubing factors are in play here. Certainly not delay. Certainly not mutual fault. There are no other real tubing factors in play. And I think it's his representation that this is somehow a de novo review is absolutely incorrect. I think it's clearly an abuse of discretion. And I think it should be affirmed. The court would do so. I'd appreciate that. Thank you. All right. Thank you. He saved you a minute and 10 seconds. Good morning. My name is Paul Goodwin and I'm here with Holly Thompson, who was the primary briefer in this case, and we represent Palm Energy Offshore LLC, one of the appellees. I think that this is a textbook case for the clearly erroneous standard when we're talking about the factual determinations, mainly because the facts, as established by Judge Vance, because of the complexity of the relationship between all the different parties, it's too easy to twist them and turn them by the time you get to the appellate court. For example, there is a party in the underlying lawsuit who is not a part of the appeal, HC Resources, and that's the entity that owned Chandelier 37, the first stop for the LB Nicole Amart. And in that scenario, there was an agreement by HC to direct pay for the charter hire to OMC. And you heard from Mr. Reich earlier that there was an agreement to direct pay, but that only relates to HC, not to Palm Energy Offshore. On page 13 of Judge Vance's order and reasons, she says, quote, contrary to Chet Morrison's contention, the court did not, she italicized not, find that job. So that is a factual finding by the court that permeates the entire argument between all of these parties. So that would negate the claim for the 15%. Not only the 15%, but I think it also relates to any of the contentions by Chet Morrison, however they would like to use those contentions, that there is a direct relationship between Palm and OMC on any issue. Now, and so when we get into the nuances of property damage versus loss, etc., and we talk about the release and who's who, that becomes very important. And so I think from a factual determination standpoint, we need to go back and remember one thing. Palm did not charter the vessel, period, and Palm did not agree to pay the contractor for any period of time. Its only contractual relationship was with Chet Morrison. Now, Mr. Bowman and the court had an exchange, and I think it was correct, which is we have various parties with various contractual relationships. Number one is that Palm hired Chet Morrison to do a cement job on West Delta 55, and when that hiring occurred . . . Now that, when you contractually . . . the Palm contract with Chet is reduced to writing. That's the master service agreement. Correct. But it was aimed, am I correct, at whatever, Well 37, and then it was an oral extension to move to Well 54? Is that wrong or right? Take a step back. That is wrong. Chandelier 37 is owned by HC Resources. Okay. It's not a part of the appeal. And the original hire was HC Resources, called Chet Morrison, and said, we have this vessel under charter, will you please extend it and move it to Chandelier Block 37, will you do it? Yes. Chet then hires OMC to get access to the lift boat to go do the work. When they were done on Chandelier 37, and the LB, Nicole Amard, was coming around the tip of Plaquemines Parish to go back to Port Fouchon, that's when Palm stepped in for the first time. Palm called Chet and said, we know you have this vessel under charter, will you please extend it and do some well work for us on West Delta Block 55, because we have a well issue and we need to pump some cement down, down into the, the well hole. So the only communication Palm ever had was with John Dale Williams at Chet Morrison. They did not call OMC.  What extension, Your Honor, I'm sorry? The extension for the use of the vessel at the second. Correct. But, but, but Palm would pay Chet Morrison whatever the fees would be. And, and if you get into just the MSA itself, this is not in the briefing, this is just in response to the, the, the give and take earlier. Palm agrees to pay contractor, in this case Chet Morrison, for goods and or services provided. Now those goods and services include the cement that gets pumped down the hole, the manpower to do the work, whatever planning needs to be done, and Chet Morrison was to provide the vessel. And they did that through their charter with OMC that was already in effect. But that amount of charter hire would be something that would be ultimately part of your payment to Chet. Correct. Now that, that leads us to another issue from a factual standpoint that I think we need to get straight. And that is that Mr. Reich, on behalf of Chet Morrison, said continuously that everyone, I think he said three witnesses agree that you paid charter hire all the way until, I forget if it was demobilization or until it departs the site. We have in our brief on page 12, the, the argument, or not the argument, the, the argument, which Mr. Garrick qualified the testimony in response to Mr. Reich's question about how long does charter hire typically industry standard last. And he did say it is until it departs the site with a caveat. So long as work is being performed. And that's why when we get into the various time periods in this case, it becomes vitally important to remember which entity had a contract with which entity. And in addition to that, what's going on during that period of time. So we, you remind me about when, when he testified to that extent, it was, I'm not remembering that that was qualified work being performed onsite as distinct from at a shipyard. It definitely is onsite if, if not by direct testimony, certainly by implication and, and that highlights, I think, but, but so let's say you have a major weather interruption. So work isn't being performed. Would your position be that Palm wouldn't have to pay for those days of interrupted work? Uh, it, it would depend very specifically on the contractual relationship between well, under this MSA, uh, I, I believe it's silent. I mean, normally you'll see a standby rate that would, would, uh, come into play because why isn't this sort of this mishap, the stuck in the mud, roughly equivalent to any other equipment malfunction or a weather interruption. You've got a lift boat out there that's supposed to be putting some men in or whatever, but then it's slowed down and no work occurs. Who pays for those days of interrupted behavior? It's contractual. That's, that's, that's not us. We only pay for services being provided. So your position would be you don't pay, but even a weather interruption or equipment failure, and that's by virtue of the release, or is that by virtue of the underlying MSA? Well, the release is in the MSA. Okay. I know, but, but are you saying, I had an oversimplistic view of this. I thought the payment for the charter hire was port to port. However, your client had negotiated a release for any portion of that hire where there was a loss. The, the, the release is in the MSA itself. So it's been pre-negotiated before any of this. Okay. But you're telling me, I think you're saying that the MSA itself, the concept of services wouldn't include, forget the indemnification clause, wouldn't include weather interrupted time on site? This MSA does not specifically talk about weather delays. What about equipment delay? It, there's a warranty by Chet Morrison that all of the equipment provided will be in workmanlike, or in, in workable order and fashion, so it can be used for the intended purposes. Is that violated by the presence of the leg, even though the work has been completed? The fact that the leg is stuck and it has to stay there, all that downtime, is that contemplated by something you would be responsible for to pay charter hire for? Absolutely not under the release. I mean, that's why the release is in there. And, and, and. Because loss refers to downtime or. Correct. Not just. Probably not just. Well, that, yeah, that was my instinct, but, but I thought there the record reflected that your client was negotiating sort of feverishly, appropriately during these weeks, thinking, okay, we don't want to keep paying, so cut the thing. No, the, the leg got stuck, and I think Judge Vance even indicated that when she was doing her analysis, she needed to look basically at what was in place when the contractual relationship started, because once the leg got stuck, once it got to port, once they had to fix it, she made a comment that everyone was doing what they had to do to protect their interest or shade things in their favor from a, a, a contract interpretation standpoint. That's why you saw Chet Morrison tell LMC, oh, bill Palm, don't bill us. And we didn't have any relationship with LMC before that. And we actually did get an invoice from Chet Morrison for the period of time that the vessel was working. But not for the period of time. Never got an invoice for that. Well, when you say never, from moment that they finished the job and cut or only cut to port. Cut to port. We did get an invoice for July 27th or 8th to July 30th, which is what Judge McCarty said, which is the onsite downtime charter. So she made the distinction between when work was being performed, which was, I think, July 27th through the 30th. And then she made the distinction that the release kicks in for anything thereafter, because as you were, were questioning Mr. Reich before or stating before that the release does create, there's a release for personal injury or death or property damage or loss. And so within the context of the ruling itself, Judge Vance classified the charter hire for the period after August 1st as a clear loss. Thank you. Thank you. Mr. Reich, you have five minutes. Clear all this up. Thank you. I'll do my best in the short brief period of time. First of all, let me begin by pointing out that the statements about what Palm testified to were just not supported by the evidence. And I do need to clarify that. John Garrett testified as the corporate representative of Palm, not as a corporate representative of HC, as a corporate representative of Palm, when he said Palm agrees to pay charter hire, Palm agreed to be direct bill. And on page 61 of his deposition as Palm's corporate rep, the question was asked, was it your expectation that the return trip of the lift boat back to port would be paid by HC or Palm? And his answer was, it's naturally assumed from that point forward until it returned, until everything was back in port, that it would been on Palm. Palm agreed to pay the charter hire, whatever it was. Whatever the charter hire was. Now we agree with Judge Clement's comments and we argued it both before Judge Vance and also we argued it on this appeal that the charter hire should have cut off as soon as the legs got stuck because the vessel wasn't operable. That's what we argued. And by the way, we never argued that three witnesses said the charter hire continues until it leaves location or until it returns to report. That's what Judge Vance found. That's not what we argued. We have always argued charter hire ends when you can't use your vessel. And in fact, that was supported by Avis Borg's testimony who said we can't charge when the vessel's broken down for some reason, and it was supported by Emarch testimony and we raised that on appeal. So it has always been our position that we do not owe charter hire past August 1st. Having said that though, Judge Vance found that charter hire went through August 18th. Now we dispute that and continue to, we think that's clear error. Okay. And I'll look back at the briefs. I didn't see you alleging that as clear error until your reply brief where you said two things. You said number one, um, they, the point you're making now. And then the second point was offshore's employees came on. It became their vessel. Yes. And those arguments weren't connected to a clear error argument in the primary appeal. Those are reply brief arguments. I think it was addressed, but, but, but, but perhaps it wasn't reply. I know we addressed it. Perhaps it wasn't the reply. I thought we addressed it though in passing, perhaps not with much detail in our original, uh, brief. Um, now I think we get down to the interest because I do want to address that. I believe that's clearly a de novo review and why? Because contrary to what counsel suggests that she found it was the custom in the industry for 18% to the contrary. One, there was no witness to testify as to custom in the industry. Two, there was no evidence introduced as to custom in the industry. Three, the court could not, and did not take judicial notice of custom in the industry. And four, she didn't find custom in the industry of 18%. She based her 18% on an invoice that was rejected by us that did not say 18% and did not say one and a half percent per month. It simply said one and a half percent. That's all. It didn't say per month. No, it did not say per month. It did that. It did not say. In fact, that's what resulted in our motion for reconsideration because she didn't clarify. She said interest at one and a half percent. And we came back and said, clearly you mean one and a half percent per annum. And when we filed the motion to clarify him, well, again, it would have been a vague, how would you quantify the judgment? I needed to know what the one and a half percent was. And that's when on her motion for reconsideration, she clarified and said, no, I meant one and a half percent per month. The invoice does not say one and a half percent per month. And if it's a contract, which I guess some theory is she's arguing, although there was no meeting of the minds and no signature and no acceptance of the contract and all the cases we cited said, you can't do that. You can't send somebody an invoice with a interest rate and that becomes the law between the parties. But if it was a contract, it was clearly ambiguous. What is the one and a half percent? I think that what we have to understand is that, uh, and one thing I think, uh, Doug Higginson, one thing you have to understand with respect to this master service agreement, the master service agreement is not specific on who pays what the agreement was between the parties. And in fact, what happened in this case is that OMC sent to us an on charter notification, $19,000 a day, by the way, plus food, which is the extras. Okay. And we in turn pass it on to Palm and Palm said agreed. Okay. So that is what they agreed to pay the $19,000 a day plus the food and the incidentals that were charged. Uh, and Palm corporate reps said we committed to pay that. If it's not, if it's not that, then they have to pay the 15%. In other words, if they didn't agree to pay charter hire directly, they have to pay charter hire plus 15%. All right. Got it. Thank you. Thank you very much. All right.